[Civ. No. 20098.   Second Dist., Div. Two.   June 25, 1954.]

WILLIAM J. MURPHY et al., Appellants, v. JIM WOOD, Respondent.

Charles L. Nichols, Ivan Miller, Thomas W. Hughes and Anthony T. Carsola for Appellants.

Thomas B. Sawyer for Respondent.

FOX, J.—This is a suit by the payees of a promissory note against the maker. From a judgment for defendant, on the ground that there was no consideration for the note, plaintiffs appeal.

In January, 1951, defendant Jim Wood and plaintiff Murphy discussed informally the acquisition of an automobile dealership. Wood was district manager for the DeSoto Motor Corporation. Murphy was an automobile dealer in Culver City. A dealership was located in San Pedro that. was for sale for $25,000. Murphy (who represented his coplaintiff throughout this entire transaction) and Wood worked out an arrangement whereby plaintiffs would furnish the money to buy the dealership, Wood to put up $10,000 working capital and operate the business at a salary of $500 per month and $150 expenses; plaintiffs' investment to be repaid out of the profits, after which defendant's investment would also be returned, and then the profits would be shared equally between the plaintiffs and the defendant. Plaintiffs provided $25,550 to purchase the business. (The price was increased $550 to cover a service truck that was added.) Defendant's contribution was made up of $8,500 cash and two automobiles valued at some $1,700. The new group took over the agency on March 1, 1951, with Wood in charge.

Murphy arranged for Charles Rollinson, who had represented his firm for some time, to handle the legal work of this new enterprise.*  Here the picture becomes somewhat

---

*Mr. Rollinson prepared an agreement which the parties executed under date of March 1, 1951. It recited the respective contributions of the parties to the capital as above stated, Wood's designation as manager, at the salary and expense allowance previously agreed upon, the fact that a corporation had been organized, and an application for a permit to issue stock was pending. This agreement, however, is unclear. As a consequence plaintiff included a second cause of action, joining the corporation as a defendant, to interpret it. At the conclusion of the trial, however, plaintiffs dismissed this cause of action without prejudice.

cloudy because Mr. Rollinson died and certain of the corporate books and records which were apparently in his possession have not been located. It does appear, however, that Mr. Rollinson had organized a corporation known as Jim Wood, Inc., with a capital of $25,000 and having 25,000 shares at a par value of $1.00 each. Defendant Wood was president and his wife was secretary. An application for a permit to issue stock was filed with the Division of Corporations. A permit was granted on April 17th, authorizing the issuance of 12,501 shares to defendant and 12,499 shares to plaintiffs for cash. Soon thereafter stock certificates for these shares, made out to the respective parties, were signed by Wood and his wife as president and secretary, respectively, and the corporate seal affixed. Wood then delivered these certificates to Rollinson, who later turned them over to Murphy. No money was then or thereafter paid to the corporation by any of the parties.

About the middle of March, Murphy told Albert Berg, an accountant, whose firm had done work for him, that he was interested in a DeSoto-Plymouth dealership in San Pedro and suggested he see Wood about "setting up the corporation." As a consequence Berg was employed to handle the accounting work of the new enterprise. He was to come in monthly and prepare quarterly reports. The corporation had its own bookkeeper. In the course of preparing the report for June 30, 1951, Berg contacted Rollinson, relative to the capital stock structure of the corporation. Rollinson advised him that the corporation had been authorized to issue 25,000 shares of $1.00 par value stock for cash. Berg told him, "the corporate records did not reflect any deposit of cash in the corporation bank account for which the corporate stock could be issued," that the $25,550, which had been used to purchase the business with, had been credited on the corporation records to an account designated "Due to Jim Wood." This, of course, was the capital furnished by plaintiffs. In order to meet this situation, Rollinson suggested that the corporation write a check in favor of Wood in the amount of $25,550 and charge that check against the Jim Wood advance account on the corporate records and that subsequently a deposit of $25,000 (out of this check for $25,550) be made in the corporation's bank account as a means of showing payment in cash for the stock. Bookkeeping entries to this effect appear to have been made though the check was not actually issued and the redeposit was not

made. Later, Berg inquired of Rollinson as to what security plaintiffs had for the $25,550 they had put up since they had only received $12,499 in stock. Berg suggested to him the execution of a note by Wood as security for plaintiffs "to represent the additional money which they had furnished for the purchase of the dealership."

The note here in suit was prepared by Rollinson. Wood signed it and endorsed the stock certificate which had been made out to him in Murphy's office. Murphy explained that Rollinson had advised it was necessary for Wood to sign these papers so that the corporate work could be concluded. Wood's explanation of this phase of the transaction was that he had wished to set the corporation up for $35,000 capitalization but that Berg had recommended that the $10,000 provided by Wood be shown as a loan to the corporation by him but "it was only a bookkeeping entry." It was Wood's impression when Murphy asked him to sign these papers that "it was to offset the $10,000" item—"that is the reason I signed the note."

Plaintiffs' first ground for reversal is that the court erred in finding there was no consideration for the note. This means, in effect, that the evidence is insufficient to support such finding. At the conclusion of the trial the court observed it did not believe that in signing the note Wood "meant to assume any personal liability"—that Rollinson, Berg and the two partners were going through a "shadow-box fiction in order to comply with the permit for the issuance of stock. . . ."

It will be recalled that at the initial conversations between Murphy and Wood about the purchase of the dealership Wood indicated he could only invest $10,000. When the purchase was made Wood had difficulty raising that amount. In fact, he had to raise most of the money by a loan on his home and pending the realization of funds from this source he borrowed $5,000 temporarily from Murphy to put into the deal. This loan, however, from Murphy was repaid when the loan on Wood's house was consummated. Even at that Wood had difficulty in meeting his $10,000 commitment. Although there is some conflict in the evidence, it justifies the inference that he actually put $8,500 in cash into the business and that the difference was represented by "approximately $1,700 worth of automobiles" according to Berg. The agreement of March 1st also refers to Wood's contribution as $10,000. There is no suggestion from any source that either Wood or Murphy

contemplated any larger investment by Wood. If, however, the note which Wood signed for $12,501 was intended as a binding obligation then he would be more than doubling his investment and increasing his indebtedness to a point that was out of line with his apparent limited financial position. Furthermore, if the note be considered as representing a loan of such portion of plaintiffs' contribution to the purchase of the business or as a purchase of stock in the corporation from plaintiffs, then their investment in the enterprise is immediately, in effect, reduced by one half. It does not appear that such results were intended or that the note was executed by Wood for either of these suggested purposes. Also, of substantial significance is the manner in which the investments of the parties were entered on the books of the corporation, and, more particularly, the application to the Division of Corporations requesting permission to issue 25,000 shares of $1.00 par value stock for cash which permission was granted. This was undoubtedly an erroneous approach to this problem and produced an unintended result. The only explanation that appears is that the principals failed to adequately explain their deal to their attorney and accountant. In any event, after the permit was granted and the stock issued, the attorney and accountant realized the setup was not what was desired; viz., cancellation of indebtedness for stock and not the sale of stock for an additional $25,000. They thereupon attempted to correct the situation by certain bookkeeping entries and a contemplated "in and out" check and redeposit transaction. The note here in question was executed at the suggestion of the attorney as a part of the effort to unscramble the situation. The trial judge characterized this as "shadow-box fiction" and drew the inference that no liability was intended by the execution of the note. These facts and circumstances furnish ample support for the finding that there was no consideration for the note.

Plaintiffs' second ground for reversal is that the court failed to find on material issues. They argue that to find there was no consideration for the note, "the trial court was forced to rule that the entire stock issuance was illegal and void, that, in effect, the entire corporate entity was some sort of *alter ego* to be disregarded. . . ." They then complain that the court failed to make any findings on these matters. Such issues were not before the court either by

the pleadings or by necessary implication. Although the trial judge expressed his opinion as to the validity of the stock issue he actually only decided that no liability was intended by the execution of the note and consequently there was no consideration for it. It was therefore unnecessary to make findings on these other questions.

Furthermore, upon the dismissal by plaintiffs of their second cause of action, wherein the corporation was named as a defendant, it left the suit as simply one between the payees and maker of a note. The judgment does not purport to determine either the status of the corporation or the validity of its stock issue.

Plaintiffs also contend that the defendant failed to perform his agreement with them in that he "never did actually advance the total sum of $10,000 and of greater importance, whatever amounts he did advance from time to time were *at his own instance* carried upon the books of the corporation as an account payable to and receivable by him from the corporation. . . ." It is true, as previously noted, that defendant did not put the full $10,000 in cash into the business. He did, however, more than make up the $1,500 difference in automobiles which he turned over to the corporation. No objection appears to have been made to this substitution. It is a fair inference that the cash and automobiles provided by defendant were then accepted by plaintiffs as full compliance with his commitment to furnish $10,000.

Plaintiffs emphasize that defendant's contribution was carried on the books of the corporation as an account payable to him and that this was done at his instance. Defendant, however, testified that Berg "suggested that we show the $10,000 as a loan to me." Berg claimed he found this entry in the books when he first examined them about the middle of March, 1951. Viewing the testimony, as we must, in the light most favorable to the successful party below, it is clear that plaintiffs' position as to who caused this entry to be made cannot be sustained. Defendant further testified "it was only a bookkeeping entry." The clear inference from this testimony is that defendant's $10,000 contribution was not in fact regarded as a debt due him by the corporation.

Plaintiffs have developed a number of hypotheses from the evidence on which they have predicated arguments which would lead to the conclusion that the note in question is supported by a consideration. The difficulty, however, with plaintiffs' position is that they would have us view the evi-

dence and evaluate it differently from the trial court, and draw inferences contrary to those drawn by that court. We, of course, must accept the trial court's appraisal of the evidence.

The judgment is affirmed.

Moore, P. J., and McComb, J., concurred.